Filed 4/4/22 (see attached dissent)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SALVADOR SOLORIO SALINAS,<br><br>    Defendant and Appellant. | B307985<br><br>(Los Angeles County<br>Super. Ct.<br>No. TA148640) |

APPEAL from an order of the Superior Court of Los Angeles County, Kelvin Filer, Judge.  Reversed and remanded.

Tracy J. Dressner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Dana Ali, Supervising Deputy Attorney General, Stacy S. Schwartz and Joseph P. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

At defendant and appellant Salvador Salinas's (defendant's) criminal trial, the prosecution used five of the eight peremptory challenges it exercised to remove Black women from the jury panel—including a prospective juror who was a sales manager, a crime victim herself, the grandchild of a retired police officer, a friend or acquaintance of "a lot" of law enforcement officers, and a prior member of a criminal jury in another case that reached a verdict. The United States Supreme Court recognized in *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) that there can be no dispute peremptory challenges "permit[ ] 'those to discriminate who are of a mind to discriminate'" (*id.* at 96), and the high court more recently re-emphasized that striking even a single prospective juror for a discriminatory purpose is constitutionally intolerable (*Foster v. Chatman* (2016) 578 U.S. 488, 499 (*Foster*)). For reasons we shall detail, the record reveals the prosecution's decision to bar the above-described Black woman from jury service is inconsistent with the guarantees of our federal and state constitutions.

I

The Los Angeles County District Attorney charged defendant with murder for killing a man having an affair with defendant's wife. At trial, the prosecution presented evidence that defendant beat the victim with a metal pipe shortly after seeing the victim rendezvous with defendant's wife in a motel room. The jury found defendant guilty of second degree murder (not first degree, as the prosecution argued), and the trial court sentenced defendant to 15 years to life in prison. Voir dire of the prospective trial jurors, which is our focus in this appeal and the procedural summary that immediately follows, proceeded over

2

the course of the first two days of defendant's trial in early February 2020.

The trial court conducted voir dire of the jury panel in groups of 21. The court itself initially solicited general background information (e.g., marital status, occupation, prior jury service) from the prospective jurors and questioned them about whether anyone had negative experiences with law enforcement officers or had friends or family who worked in law enforcement. The court then permitted the attorneys to voir dire the group. After attorney voir dire and challenges for cause, the trial court invited the parties to exercise peremptory challenges until 10 of the original group of 21 had been dismissed. At that point, additional prospective jurors were called from the panel to again comprise a group of 21, and the newly-called prospective jurors were questioned in the same manner.

There were at least four Black women in the first group of 21 prospective jurors: prospective juror number 3505 (Juror 3505), prospective juror number 5542 (Juror 5542), prospective juror number 8832 (Juror 8832), and prospective juror number 8061 (Juror 8061).[1]

Juror 3505 was employed as a recruiting trainer in the financial services industry and married with two children. She previously served on a criminal jury, she had never been the victim of a crime, and her hobbies included golf and ministry work. When the trial court generally informed the prospective jurors that some evidence may be admitted at trial for a limited

---

[1]     We will return to the point later, but we have only limited information concerning the race and gender composition of the jury panel as a whole because the parties and the trial court did not make a comprehensive record.

3

purpose, Juror 3505 asked whether that meant they were not supposed to use "reasonable deduction." The court clarified that "reasonable deduction" and use of common sense was permitted, and Juror 3505 said she understood and decided to ask the question "[b]ecause I can think for myself." When the court asked Juror 3505 if she could "commit[ ]" to following the court's instructions, she responded, "I'll attempt to." Later, when the court questioned the jury about any negative experiences with law enforcement, Juror 3505 said she was given a traffic ticket over 10 years earlier and fought the ticket in court. Juror 3505 said she thought the officer who wrote the ticket lied under oath and the judge who decided the matter was unfair for believing the testimony of the officer instead of her. When asked whether this experience left her with any "ill feelings towards law enforcement in general," Juror 3505 demurred, explaining she could be a fair and impartial juror in defendant's case and clarifying she "just . . . d[id]n't believe everything everyone says" as a result of the traffic ticket experience.[2]

Juror 5542 was a single college student who had never been the victim of a crime and never served on a jury. Her hobbies were shopping, watching television, and "going out." In response to questions from the trial court, Juror 5542 said she was

---

[2] The trial court told Juror 3505 that she would be asked "to consider only the evidence that comes from this [witness] stand and follow only [the court's] instructions on the law, not because they're coming from [the court], but [because] that's what the law is . . . ." The court asked Juror 3505 whether she thought she could do that, and when Juror 3505 said she believed she could, the trial judge agreed, saying, "I think you can. I believe we're on the same page."

4

studying to be a paralegal, wanted to go to law school, and hoped to be a criminal defense lawyer. The court then asked questions to verify Juror 5542 would not be biased against the prosecution because of her interest in doing defense work, and Juror 5542 repeatedly affirmed she could be fair to both sides at trial.

Juror 8832 was an eighth grade teacher and married with two children. Her hobbies included reading and going to church. She had never served on a jury and, in response to a question from the court about whether she had been a victim or witness to a crime, she said she had because of a "crisis in Nigeria." Juror 8832 did not elaborate, but she did confirm the experience would not affect her ability to evaluate the evidence in defendant's case.

Juror 8061 is the prospective juror we described at the outset of our opinion. She was a national sales manager for a credit card company and her hobbies included puzzles, shopping, and singing. She previously served on a jury that reached a verdict in a criminal case. She reported she was the victim of an assault in college (20 years earlier) and testified at her assailant's trial; when asked by the court if the experience left her with any "ill feelings" toward defense attorneys, Juror 8061 said "none whatsoever." Regarding friends and family in law enforcement, Juror 8061 said her grandfather was "retired L.A.P.D.," her best friend was a security guard who had applied to work as a deputy sheriff, and she had "a lot" of acquaintances who were police officers because she worked with them "as an auto broker."

After the trial court completed its initial examination of the first group of prospective jurors, the attorneys for the defense (defendant was tried with a co-defendant) began their voir dire. Following initial questioning about the doctrine of self-defense, the defense questioned individual prospective jurors who

5

disclosed they had friends or family in law enforcement. Juror 8061 (the sales manager) said she did not think she had any bias and did not regularly speak to the people she knew in law enforcement about their cases. Juror 8061 was also asked whether she had any bad feelings about her prior jury service and she said she had none at all. In addition, the defense asked Juror 8061 whether she thought a defendant must have done something wrong by virtue of being in court facing a criminal charge; she answered "[n]o, not necessarily."

When it came time for the prosecution's voir dire, the prosecutor asked the prospective jurors to consider a hypothetical scenario that we will recount at length because the prosecutor would later rely on colloquy concerning the hypothetical to excuse Juror 8061. The prosecutor said: "Now, let's say you have a mom and you have a son. Okay. It's a summer day. And the son is about five years old. And he tells his mom, hey, mom can we go swimming? And the swimming is in one of those kiddie pools you buy at Toys R Us. [¶] . . . [¶] The mom fills it up. Mom says, okay. Go get your swim trunks on, your goggles, get your floaties, come back outside. He runs in, gets dressed, comes back outside. And they're about to walk outside, but the mom is, like, oh shoot. I forgot my cellphone. Wait right here. Don't go in the pool. Do not go in the pool. [¶] So she goes back. She gets her cellphone. She comes back. Her son is not standing there, but he's standing about ten feet away. Okay. There's little footprints on the ground that are wet and he's soaking wet."

The prosecution asked, "Just from those facts what is the most reasonable answer," and first called on Juror 3505 to answer. Juror 3505 answered, "He got in the pool." The prosecution then turned to another Black female prospective

6

juror, Juror 8832, and asked if she believed the same thing. She said yes.

After posing the question to two additional prospective jurors (who gave the same answer), the prosecution then asked another question of all the prospective jurors based on the same hypothetical: "Who here thinks it's possible his neighbor, the kid's neighbor, jumped over the fence, grabbed him, put him in the pool, dragged him, pulled him aside? Raise your hand if you think that's a possibility." At least seven prospective jurors raised their hand,[3] including Juror 8061 and Juror 3505. The prosecution then asked, "now, based on the facts I gave you, just based on the facts, what is the reasonable answer of the [prospective jurors] who raised their hand?" Juror 3505 said, "Well, for sure he was probably wet from the pool" but added, "now the question becomes how did he become wet." The prosecution responded: "Just on those facts alone, just on those facts alone the kid probably jumped in the pool himself, right? Because there wasn't any fact that the guy jumped over the fence and then there wasn't a factual scenario where an alien grabbed him, put him in the pool, right? We don't believe that, right? [¶] So the reason I'm telling you this hypothetical is because anything is possible, but my job is to prove to you beyond a reasonable doubt. Not all doubt. A reasonable doubt. [¶] So everybody that raised your hand, will it change your answer when I say what is the reasonable answer here?"

---

[3]     The prosecution identified seven prospective jurors on the record by seat number. One of the prospective jurors that raised his hand was in seat 19 and was ultimately seated on the trial jury as juror number 3.

Juror 8061 then responded, asking the prosecutor to confirm he wanted to know what the reasonable answer was. When the prosecution affirmed that was indeed the question, Juror 8061 said, "The reasonable answer is that he got in the pool. I don't know that for a fact. I'm assuming the sprinklers could have c[o]me on." The prosecution responded, "Based on the factual stuff, I didn't give you any of that stuff." When Juror 8061 replied she was thinking anything could have happened, the prosecution conceded, yes, anything could have happened, but asked Juror 8061 what the reasonable answer was. Juror 8061 then repeated what she said earlier: the reasonable answer was that the boy got in the pool.

After further voir dire by the prosecution, including additional hypothetical scenarios involving marital infidelity and principles of aiding and abetting, the prosecution asked the prospective jurors to raise their hands if they promised to "follow the law and execute based on that" rather than letting sympathy or emotions influence their verdict. Believing that Juror 8832 and another prospective juror in seat number nine had not raised their hands, the prosecution inquired further. The prosecution asked Juror 8832 if she would use emotions and sympathy and she responded, "I wouldn't say emotion, sympathy." The prosecution then called on the prospective juror in seat nine and s/he said, "You never know how the people inside the room [are] going to react, too. So basically on that you have to." The prosecution asked "other than that," can you still follow the law and return a verdict regardless of how you feel about the case emotionally; the prospective juror in seat nine said yes.[4]

---

[4] The prosecution asked this same question of three other prospective jurors, including Juror 3505. All responded yes.

With attorney voir dire of the first group of prospective jurors complete, the trial court invited the parties to begin exercising peremptory challenges, starting with the prosecution.[5] The prosecution first struck Juror 3505. After two additional peremptory strikes, including the prospective juror in seat nine, the prosecution's next two peremptory strikes were used against Juror 5542 and Juror 8832.

When the prosecution asked the court to excuse Juror 8832, the defense made a *Batson* motion at sidebar.[6] The defense represented, without dispute, that three of the prosecution's peremptory challenges had been exercised against Black women, and the defense argued this pattern of strikes warranted compelling the prosecution to state its reasons for excluding the Black women prospective jurors.[7] The trial court agreed, explaining that just by the "sheer number" of strikes used against Black women it would "require the People to provide a race neutral reason for the use of those peremptories." The prosecution then articulated a statement of reasons on the record.

---

[5] Because the only challenges to peremptory strikes in this case were made by the defense, we focus our attention on the peremptory challenges used by the prosecution.

[6] Such motions are often referred to as *Batson*/*Wheeler* motions to account for our Supreme Court's holding in *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) that, like *Batson*, prohibits discrimination on the basis of race in jury selection. For simplicity, we use "*Batson* motion" as shorthand.

[7] The defense also represented, again without dispute, that the prosecution's two other peremptory challenges were exercised against Hispanic males.

As to Juror 3505 (the prosecution's first strike), the prosecutor stated he believed she "asked a lot of questions that were basically contrary to what I believed or contrary to our positions." The prosecutor additionally opined Juror 3505 was "aggressive" because "she said 'I can think for myself' especially when she was being questioned." Commenting further, the prosecutor mentioned Juror 3505 had a negative experience with law enforcement and "became emotional" about the officer that she believed "lied against her." The prosecutor also mentioned "[o]ne of the other reasons that [he] did end up kicking her," namely, his belief that Juror 3505 raised her hand and said "anything is possible" in response to his pool hypothetical.

As to Juror 5542 (the prosecutor's fourth strike), the prosecutor referenced her desire to do criminal defense work and stated this indicated she would be biased toward defendant and unfavorable toward law enforcement and the prosecution.

Finally, as to Juror 8832, the prosecutor stated the reason he excused her was because she did not raise her hand when he sought a commitment that prospective jurors would not resort to sympathy or emotion in deciding the case. The prosecutor also mentioned his perception of Juror 8832's demeanor, stating she and the prospective juror in seat nine were sitting with their arms crossed looking at him in what he described as a "defensive posture."

At the conclusion of the prosecutor's statement of reasons, the trial court denied the *Batson* motion. The court stated: "All right. So [the prosecutor's] recitation of the responses is accurate, and I will find the People have provided specific race neutral reasons for the peremptory challenges . . . ."

10

Jury selection continued thereafter, with the trial court calling several additional prospective jurors from the jury panel to again comprise a group of 21 and replace those that had been excused. The court proceeded in the same fashion by first questioning the newly called prospective jurors and then permitting attorney voir dire.

There was at least one additional Black woman among the 10 additional prospective jurors called to join the new group of 21: prospective juror number 5064 (Juror 5064). Because it will be pertinent to our discussion later in this opinion, we will also briefly recount the particulars of another prospective juror— initially sitting in seat number 17 and ultimately seated on the trial jury—whose race is not revealed by the record.

Juror 5064 was a single woman employed by Coca-Cola whose hobbies included watching sports. She previously served on a criminal jury in a domestic violence case that did not reach a verdict, but she expressed no reservations about serving as a juror in defendant's case as a result of her prior jury experience. When asked about prior negative experiences with law enforcement, Juror 5064 described an incident during her earlier service in the military when, while in uniform, she was held at gunpoint by White police officers at a gas station in the Riverside area (who were reported to have said "we don't like your kind over here"). According to Juror 5064, the police permitted her to leave after she called her military commander and she later filed a complaint against the officers (she was unaware of whether or how the complaint was resolved). The trial court asked Juror 5064 if she would be able to be fair to the parties in this case notwithstanding that experience and she said she said she would.

The juror in seat 17 was a married retiree with two children. He previously served twice on criminal juries in attempted murder cases and both juries reached verdicts (the juror revealed, before the court could stop him, that the verdicts were guilty verdicts). The juror in seat 17 also reported he had twice been the victim of a crime, once when someone tried to break into his house when he was out of state and another time when his truck was vandalized. When asked, he told the court there was nothing about either experience that would cause him to hold it against either the defense or the prosecution.

During attorney voir dire of the second group of 21 prospective jurors, the prosecutor returned to the pool hypothetical he used with the first group. After confirming the new prospective jurors recalled the facts of the hypothetical, the prosecutor called on the juror in seat 17, apparently believing it looked like he (the juror) was about to say something. The juror said, "Well, if you want me to say something, I will. So you found the child wet. You sure it didn't rain?" The prosecutor responded he "didn't give you that fact," and a longer exchange between the juror in seat 17 and the prosecutor ensued in which the juror twice said anything was possible but ultimately agreed the child probably jumped in the pool.[8]

---

[8] This was the full exchange: "[Prosecutor]: I think—I didn't give you that fact did I? Just checking. [¶] So no other possible answer? [¶] [Prospective Juror]: Anything is possible. That's what you said. [¶] [Prosecutor]: No. I didn't say that. Not on that. The reason why I said it is—anything is possible but with the facts that I gave you, the reasonable answer is what? [¶] [Prospective Juror]: Anything can happen. It's possible. [¶] [Prosecutor]: No. No. In terms of the facts I gave you surrounding that particular case. The kid went in the pool,

The prosecutor and the juror in seat 17 later had another exchange concerning the prosecutor's voir dire about infidelity. The prosecutor asked whether anyone agreed or disagreed with the statement that a person who found out about infidelity could use physical force "regardless of the situation." The juror in seat 17 responded, "It depends." Asked to elaborate, the juror mentioned sometimes people's emotions "take over their mental state" and "that's why people hurt people." The prosecutor inquired whether that meant emotion was an excuse to use physical violence, and the juror responded, "[n]ot in general, but when you ask that it can happen, you know, they're just human beings" before subsequently clarifying that he thought using physical force was not okay "[u]nder the law."

Once attorney voir dire of the second group of prospective jurors was complete, the trial court entertained challenges for cause. The prosecution expressed concern about Juror 5064 (the former military service member), believing her experience with the police at the gas station in Riverside would impact how she viewed law enforcement and "would be an issue especially in this case." The trial court disagreed and declined to excuse Juror 5064 stating, "I think she's a strong juror. She said upfront she didn't like the way she was treated. She reported it, dealt with it[,] but she also understands that that situation has nothing to do with the current case."

Following challenges for cause, the parties again exercised peremptory challenges. After first striking another prospective juror, the prosecution used a peremptory challenge to excuse

right? [¶] [Prospective Juror]: Yeah. He probably jump[ed] in the water."

13

Juror 5064.  Then, after asking the trial court for a momentary pause in the proceedings, the prosecution used its next peremptory challenge to strike Juror 8061, the sales manager with friends and family in law enforcement who was part of the initial group of prospective jurors called.  This triggered a second *Batson* motion from the defense.

At sidebar, the defense emphasized the prosecution struck two more Black female prospective jurors since the prior *Batson* motion.  The defense did not vigorously contest the prosecution's strike of Juror 5064, stating the prosecution may have been concerned about her experience with the police in Riverside even though it seemed she could be fair.  But the defense did strenuously object to the challenge to Juror 8061.  The trial court required the prosecutor to state the reason why he struck that prospective juror.

This, verbatim, is the entirety of the prosecutor's explanation:  "The reason I dismissed her, Your Honor, was in regards to her responses when I gave the hypothetical in regards to the reasonable versus possible.  She did give pushback on what she stated was possible.  And I tried to explain the reasonable issue.  She basically tried to explain it away saying anything is possible.  And that was one of the reasons why.  [¶]  This case— obviously we're dealing with reasonable as opposed to possible, and a juror who thinks of other possible answers away from the facts I think would present an issue.  And that was the reason why I kicked her."

Without inviting a reply from the defense, the trial court ruled as follows:  "All right.  I mean, I didn't keep those exact notes, but I do remember her response along those lines.  So I'll indicate that the People have provided a race neutral reason for

14

excusing that particular juror and deny the *Batson . . .* motion at this time." The court noted for the record that at the time of the prosecutor's strike of Juror 8061 there were "two Black females and one other Black male at least who are in the [jury] box . . . ." The court did not, however, describe the race or gender composition of the jury panel as a whole, nor did the court identify which of the prospective jurors that remained in the "box" were Black such that we might determine whether any or all were ultimately seated on the jury.

Although the trial court had already made its ruling on the *Batson* motion, the defense interjected with further argument anyway. The defense emphasized there were other prospective jurors who responded similarly to the prosecution's pool hypothetical but were not stricken by the prosecution. The defense further argued Juror 8061 had not in fact said she "was only going to look towards the possible," and the defense explained the hypothetical itself "opened up for [the prospective jurors] to think of the possible." With these points made, the defense said "submitted" and the trial court's only response was to say "[a]ll right."

Once *Batson* proceedings at sidebar concluded, the trial court excused Juror 8061 and proceeded with jury selection. The prosecution exercised no further peremptory challenges (twice accepting the panel as constituted) and the defense exercised three. After voir dire of several additional prospective jurors called by the trial court from the jury panel, and excusal of one for cause, the parties then stipulated to accept the jury as then constituted, including designating three alternate jurors. As already mentioned in passing, the aforementioned juror in seat

15

17 (the married retiree) was seated on the trial jury as juror number 7.

II

The Equal Protection Clause of the United States Constitution and the California Constitution's guarantee of a jury drawn from a representative cross-section of the community prohibit parties from using peremptory challenges to strike a prospective juror because of his or her race. (*Batson*, *supra*, 476 U.S. at 89; *People v. O'Malley* (2016) 62 Cal.4th 944, 974 (*O'Malley*).) Ordinarily, courts determine whether these constitutional rights have been violated by employing a three-stage burden shifting procedure: the moving party must first establish a prima facie case of discrimination by showing the totality of the relevant facts gives rise to an inference of discriminatory purpose; the burden then shifts to the party using the peremptory challenge to come forward with a race-neutral explanation for striking the prospective juror(s) in question; and a court then considers whether the prosecution's stated justification is credible and whether, in light of all relevant circumstances, the defendant has shown purposeful race discrimination. (*People v. McDaniel* (2021) 12 Cal.5th 97, 122 (*McDaniel*); *O'Malley*, *supra*, at 974.) In an appeal like this, where the trial court required the prosecution to state its reasons for exercising peremptory challenges, we skip the first two steps and move straight to considering the credibility of the prosecution's stated reasons and whether the record as a whole reveals a discriminatory motive for removing even a single prospective juror. (*McDaniel*, *supra*, at 122; *People v. Baker* (2021) 10 Cal.5th 1044, 1076 ["Because the trial court found a

16

prima facie case of racial discrimination and the prosecutor stated a reason for the strikes at issue, the question before us is whether defendant has shown it "'more likely than not'" that at least one of the "'challenge[s] was improperly motivated'"] (*Baker*); see also *Foster*, *supra*, 578 U.S. at 499.)

As we go on to explain, the record does reveal such an improper motivation for the strike of Juror 8061. Ordinarily, we accord due deference to a trial court's denial of a *Batson* motion, but that deference is not warranted here because the trial court did not make a reasoned effort (we have no doubts about the court's sincerity) to evaluate the nondiscriminatory justification the prosecutor offered for striking Juror 8061. (*McDaniel*, *supra*, 12 Cal.5th at 122.) So we undertake our own review of the record and see evidence indicating Juror 8061 was more likely than not excused at least because of her race (and maybe even because of her race *and* gender, given the facts of defendant's offense): the "sheer number," as the trial court itself put it, of peremptory challenges directed at Black women prospective jurors; Juror 8061's background that by all appearances would make her an ideal juror for the prosecution; the obviously pretextual reason given by the prosecution for excusing Juror 8061; and the prosecutor's on-the-record statement that another Black female prospective juror was "aggressive" because she said she could think for herself. That between one and three Black people may have remained on the jury after the prosecution withstood the two *Batson* motions does not dispel the conclusion we draw; the United States and California constitutions prohibit not only efforts to exclude one race entirely but also subtler yet discernable efforts to obtain a racially composed jury that is

17

better to an attorney's liking.  (See, e.g., *People v. Snow* (1987) 44 Cal.3d 216, 225.)

A

At the third stage of *Batson* review, "courts look to all relevant circumstances bearing on the issue of discrimination.  [Citation.]  Relevant circumstances may include the race of the defendant, the ultimate racial composition of the jury, the pattern of strikes, and the extent or pattern of questioning by the prosecutor during voir dire.  [Citations.]  A court may also consider the fact that the prosecutor impermissibly struck other jurors 'for the bearing it might have upon the strike' of the challenged juror.  [Citation.]  The high court has also held that comparative juror analysis may be probative of purposeful discrimination at *Batson*'s third stage.  [Citation.]" (*McDaniel*, *supra*, 12 Cal.5th at 122; see also *Baker*, *supra*, 10 Cal.5th at 1080 [the race of the defendant or victim and a challenged prospective juror need not be identical; "a litigant may raise a *Batson/Wheeler* objection regardless of the race of the defendant or the victim"]; *People v. Smith* (2018) 4 Cal.5th 1134, 1148 ["'[E]vidence of comparative juror analysis must be considered . . . even for the first time on appeal if relied upon by the defendant [if] the record is adequate to permit the urged comparisons'"].)

Our ability to undertake this third stage review is made more difficult because the parties and the trial court did not make a robust record when the *Batson* issues were raised.  Our Supreme Court has emphasized that making an adequate record may be "onerous," but "the obligation to avoid discrimination in jury selection is a pivotal one" and "[i]t is the duty of courts and

18

counsel to ensure the record is both accurate and adequately developed." (*Baker*, *supra*, 10 Cal.5th at 1080.) We nonetheless do not have a record of the overall racial composition of either the jury panel or the trial jury that was seated, nor do we know the race of prospective jurors who were not individually discussed during *Batson* proceedings at sidebar. That is unfortunate. But the deficiencies in the record do not make our task impossible. As we shall explain, even with the information that is lacking, we still see good evidence establishing it is more likely than not that Juror 8061 was stricken because of her race.

In undertaking that evidentiary review, the ordinary deference given to a trial court's ruling is unwarranted here. (See, e.g., *McDaniel*, *supra*, 12 Cal.5th at 122 ["We defer to a trial court's ruling only if the court has made a "'sincere and reasoned effort to evaluate the nondiscriminatory justifications offered'" by the prosecutor"].) That is so for several reasons.

First, at the time the defense objected to the strike of Juror 8061 (which came quite some time after the key moments when she was the focus of individual voir dire), the trial court acknowledged on the record that it "didn't keep those exact notes" and mustered a recollection of her responses as recounted by the prosecution as being only "along those lines." The absence of a precise recollection that both of these comments reveal is reason not to accord ordinary deference—particularly when, as we will explain, the trial transcript demonstrates the prosecution's recollection of Juror 8061's responses was inaccurate.

Second, the trial court gave the defense no opportunity to respond to the prosecution's proffered nondiscriminatory reason for striking Juror 8061 before making its ruling. Then, when the defense interjected with argument anyway to point out (correctly,

19

as we will explain) that other prospective jurors responded to the prosecution's pool hypothetical in a similar manner but were not stricken, the trial court undertook no follow up whatsoever. That again is reason not to defer. (See, e.g., *McDaniel*, *supra*, 12 Cal.5th at 123 ["In *Gutierrez*, we distinguished 'neutral reasons for a challenge [that] are sufficiently self-evident, if honestly held, such that they require little additional explanation' from situations where 'it is not self-evident why an advocate would harbor a concern.' ([*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1171 (*Gutierrez*)].) In the latter instances, particularly where 'an advocate uses a considerable number of challenges to exclude a large proportion of members of a cognizable group,' the court must 'clarif[y] why it accepted the . . . reason as an honest one.' (*Ibid.*)]," cleaned up;[9] *People v. Hardy* (2018) 5 Cal.5th 56, 76-77

[9]     Justice Kim's dissenting opinion cites *People v. Miles* (2020) 9 Cal.5th 513, 542 (*Miles*) to claim a cursory finding by a trial court will suffice unless the race-neutral reason the prosecutor offers is "inherently implausible." *Miles* cites *Gutierrez* for that proposition, and *Gutierrez* in turn cites *People v. Silva* (2001) 25 Cal.4th 345 (*Silva*). (*Miles*, *supra*, at 539; *Gutierrez*, *supra*, 2 Cal.5th at 1171; *Silva*, *supra*, at 386.) The better reading of *Silva* and *Gutierrez*, however, is that a trial court is excused from making specific findings or questioning an attorney making a peremptory challenge when the attorney's reason is supported by the record and inherently plausible—not that specific findings are necessary only when the proffered reason is inherently *im*plausible. (*Silva*, *supra*, at 386 ["When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings"]; *Gutierrez*, *supra*, at 1171 ["Yet when it is not self-evident why an advocate would harbor a concern, the question of whether a neutral explanation is genuine and made in good faith becomes more pressing. That is particularly so

(*Hardy*); see also *People v. Lenix* (2008) 44 Cal.4th 602, 624 ["[C]omparative juror evidence is most effectively considered in the trial court where the defendant can make an inclusive record, where the prosecutor can respond to the alleged similarities, and where the trial court can evaluate those arguments based on what it has seen and heard"].)

Third and finally, the on-the-record ruling the trial court made after the prosecution stated its ostensible reason for striking Juror 8061 reveals a misapprehension of the governing legal framework. (*Baker*, *supra*, 10 Cal.5th at 1078 ["Deference may also be inappropriate when the court evinces a misunderstanding of the legal inquiry"].) When the prosecutor stated he excused Juror 8061 solely because of her response to his pool hypothetical, the trial court said, in pertinent part, "I do remember her response along those lines. So I'll indicate that the people have provided a race neutral reason for excusing that particular juror and deny the *Batson* . . . motion at this time." That, however, is not an evaluation of the genuineness of the prosecutor's reason for striking Juror 8061, which is the ultimate touchstone of a *Batson* inquiry.[10] (*Id.* at 1076 [question of

when, as here, an advocate uses a considerable number of challenges to exclude a large proportion of members of a cognizable group"].)

As we shall explain, the prosecutor's reason in this case does not even reach the plausible threshold; the idea that Juror 8061's response to the esoterically framed pool hypothetical could further be deemed an *inherently* plausible reason for excluding her from jury service beggars belief.

[10] The trial court similarly ruled on the first *Batson* motion ("So [the prosecutor's] recitation of the responses is accurate, and I will find the People have provided specific race neutral reasons

whether discrimination has been shown ordinarily depends on the "'subjective genuineness'" of race-neutral reasons]; *Hardy*, *supra*, 5 Cal.5th at 76 ["'At the third step of the *Batson*/*Wheeler* analysis, the trial court evaluates the credibility of the prosecutor's neutral explanation'"].)  It is instead merely an affirmation (albeit a mistaken one) that the prosecutor remembered and articulated what Juror 8061 said during voir dire.  But *Batson* proceedings are neither memory competitions nor assessments of note-taking prowess.  So far as the record reveals, the trial court held the prosecution to a far lower burden than the law requires (mere recollection, not genuine motivation), and this is a further reason why commonly warranted deference is inappropriate and we instead rely on our own independent review of the record.  (*Gutierrez*, *supra*, 2 Cal.5th at 1159; cf. *People v. Battle* (2021) 11 Cal.5th 749, 772 [undertaking de novo review where it was unclear from the record whether the trial court applied the appropriate legal standard].)

B

One indisputable fact is immediately apparent from this record: the prosecution used a sizeable number of its peremptory challenges to remove Black women from the jury panel.  Of the eight peremptory challenges exercised by the prosecution, five (or 62.5 percent) were used to strike Juror 3505, Juror 5542, Juror 8832, Juror 5064, and Juror 8061.  This percentage does not alone make out a *Batson* violation, of course, because there could

---

for the peremptory challenges . . . ."), and the similar rulings illustrate there is a legal problem, not simply an unartfully articulated rationale.

be legitimate nondiscriminatory reasons for the strikes and the record does not disclose the overall racial composition of the jury panel.[11] At the same time, however, this is an easily seen pattern that is explainable by reliance on race (and gender) conscious jury selection, and the evidentiary value of the sizeable number of strikes remains relevant at *Batson*'s third stage. (*Miller-El v. Cockrell* (2003) 537 U.S. 322, 340; *McDaniel, supra*, 12 Cal.5th at 122). Put more succinctly, the relatively high number of strikes used against a protected group like the one here means we should be especially attuned to the reasons the prosecution gave for peremptory challenges that fell so heavily against Black women.

The law governing evaluation of a prosecutor's proffered reasons for exercising a peremptory challenge is straightforward. "[W]hen illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A *Batson* challenge does not call for a mere exercise in thinking up any rational basis." (*Miller-El v. Dretke* (2005) 545 U.S. 231, 252

---

[11]    In *People v. Rhoades* (2019) 8 Cal.5th 393, 429 (*Rhoades*), our Supreme Court did not conclude the prosecution's use of four out of eight peremptory challenges against Black women gave rise to an inference of discrimination when considering the "totality of the circumstances"—which in that case included obvious race-neutral reasons for the prosecution's peremptory challenges (strong views against the imposition of the death penalty). (*Id.* at 424, 429-432.) Unlike *Rhoades*, the prosecution here used *over* half of its peremptory challenges against Black women and the circumstances are quite different: there are no race-neutral reasons, obvious or otherwise, that would explain the prosecution's strike of Juror 8061.

(*Miller-El II*); accord, *Miles*, *supra*, 9 Cal.5th at 542; *Gutierrez*, *supra*, 2 Cal.5th at 1170.)

Here, the prosecutor expressed no concerns about Juror 8061, e.g., demeanor, that cannot be gleaned from a review of the trial transcript. Rather, the prosecutor articulated only one reason for excluding her that we have already quoted in full: Juror 8061's reaction to his pool hypothetical. The prosecutor said Juror 8061 gave "pushback on what she stated was possible," and when he "tried to explain the reasonable issue" she "basically tried to explain it away saying anything is possible."

The prosecutor's recollection of Juror 8061's response to the hypothetical, however, is not accurate, and the inaccuracy is all the more striking because the prosecutor asked the court for a pause in the proceedings that gave him time to reflect before peremptorily challenging Juror 8061. To review, this is what happened. Juror 8061 asked the prosecutor if he wanted to know what was the reasonable conclusion to draw from the hypothetical, he said he did, and the very first words out of her mouth were precisely the answer the prosecutor claimed he was hoping to hear: Juror 8061 said, "The reasonable answer is that he got in the pool."[12] Juror 8061 then added that she did not

[12] Justice Kim states Juror 8061 agreed the reasonable answer was that the child got in the pool only "after a back-and-forth with the prosecutor" and Justice Kim similarly refers to Juror 8061's "ultimate" agreement with the prosecutor on the reasonable answer. These statements give the impression that Juror 8061's agreement about the reasonable answer was somehow begrudging. We have reproduced what the trial transcript reflects, and it is inconsistent with Justice Kim's characterization.

24

know that "for a fact" because the sprinklers could have come on, but that observation (distinguishing the reasonable from the possible) was consistent with how the prosecutor framed the hypothetical in the first place: he told the prospective jurors that "anything [wa]s possible" but his job was to prove it to the jury beyond a reasonable doubt, not all doubt. Notwithstanding his own framing, however, the prosecutor responded to Juror 8061's qualification of her answer by saying he "didn't give [her] any of that stuff," by repeating (curiously enough) that "[a]nything could have happened," and by again asking what the "reasonable answer" was. Juror 8061 then repeated without qualification what she first said: the child got in the pool.

The prosecutor's claim that this exchange (in which Juror 8061 gave him the answer he wanted and acknowledged the same qualification he already acknowledged) reflects "pushback" by Juror 8061 does not square with the record. It instead reads as reaching—i.e., as the prosecutor's belief Juror 8061 said something different than she did because the prosecutor did not want her on the jury—and it stands as significant evidence of discriminatory intent. (See, e.g., *Silva*, *supra*, 25 Cal.4th at 385 ["Although an isolated mistake or misstatement that the trial court recognizes as such is generally insufficient to demonstrate discriminatory intent [citation], it is another matter altogether when, as here, the record of voir dire provides no support for the prosecutor's stated reasons for exercising a peremptory challenge and the trial court has failed to probe the issue [citations]"].)

The pretextual quality of the prosecutor's stated reason for striking Juror 8061 becomes even more obvious when we look to the voir dire of two prospective jurors who the prosecutor did not peremptorily challenge and who were ultimately seated on the

25

jury: the juror in seat 19 among the first group of prospective jurors examined and the juror in seat 17 among the second group. When the prosecutor first asked for a show of hands for any prospective juror who believed it was possible that the hypothetical child's neighbor jumped over the fence and dragged the child in the pool, the juror in seat 19 was among the prospective jurors who raised their hands. But the prosecutor did not ask that juror *any* follow up questions about the hypothetical, much less object to that juror serving on the trial jury. Later, when the prosecutor returned to the pool hypothetical with the second group of prospective jurors, the juror in seat 17 engaged in what *is* fairly described as pushback against the prosecutor's view of the hypothetical—certainly far more than Juror 8061 did.[13] Yet the prosecution did not peremptorily challenge the juror in seat 17 either, and he too was seated on the trial jury.

Because the trial court and the parties did not make a record of the race of prospective jurors who reacted to the pool hypothetical (despite a defense objection on this specific ground), we do not know the race of the jurors in seats 17 or 19. This limits to a degree the strength of the inference we can draw from a comparison with Juror 8061, but it does nothing to undermine the comparative value for the key purpose for which we make the comparison, namely, to show that the prosecutor's reason for excusing Juror 8061 was obviously pretextual. If the prosecutor were so concerned with Juror 8061's response to the hypothetical that it was the sole reason he struck her, the prosecutor should have been even more concerned about the juror in seat 17 making

---

[13] The juror in seat 17 also expressed some ambivalence about the use of physical force by people who learn of infidelity.

26

it on the jury and the prosecutor would have at least *questioned* the juror in seat 19 about the hypothetical before permitting him to be seated as a trial juror. (See, e.g., *Miller-El II*, *supra*, 545 U.S. at 244 ["In light of [the prospective juror's] outspoken support for the death penalty, we expect the prosecutor would have cleared up any misunderstanding by asking further questions before getting to the point of exercising a strike"].) The prosecutor, of course, did neither, and we draw the natural conclusion: the reason given for excusing Juror 8061 was mere makeweight.

At this point in our analysis, we accordingly have the following scenario: the prosecution struck five Black women from the jury panel and the prosecution's only stated reason for striking one of the women, Juror 8061, does not hold up. We now add a further point looking at the matter from the opposite perspective: the facts in the record that suggest not only is there no valid reason explaining the prosecution's strike of Juror 8061, there are several reasons why she "should have been an ideal juror in the eyes of a prosecutor . . . ." (*Miller-El II*, *supra*, 545 U.S. at 247.) Juror 8061 had no prior negative experiences with law enforcement and she had family, a best friend, and "a lot" of acquaintances who worked in law enforcement. (See, e.g., *People v. Chism* (2014) 58 Cal.4th 1266, 1321 [prospective juror's strong ties to law enforcement suggested he would be a favorable juror for the prosecution].) She also had been a crime victim herself, she had managerial experience at work, and she had previously served on a criminal jury that reached a verdict.[14] With limited

_____

[14]    We, of course, cannot be certain what the verdict was, but her prior jury service was at least an indication that the prosecution should be relatively less concerned about a hung jury

27

time for voir dire, parties may sometimes feel compelled to rely on legally permissible generalizations even though there is a risk they might not hold in any individual case; from that perspective, it does not get much better for the prosecution than a prospective juror like Juror 8061.  Yet the prosecution still excluded her.

What we have already said is enough, but in assessing the existence of purposeful discrimination against Juror 8061 we also find some relevance in the prosecutor's reference to Juror 3505 as "aggressive" when stating the reasons why he challenged her. (*Batson*, *supra*, 476 U.S. at 97 ["[T]he prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose"]; see also *McDaniel*, *supra*, 12 Cal.5th at 122 [courts may consider a prosecutor's strike of other prospective jurors for the bearing it might have on the strike of the challenged prospective juror].)  We do not believe use of the word "aggressive" should always or even frequently be understood to be a stereotype-laden term; there are surely some number of Black women in this state who could be fairly described, without suspicion (or negative connotation), as aggressive based on their behavior.  Prosecutors should not feel as if they must adhere to an unwritten speech code when explaining the reasons for their peremptory challenges.  In other words, context matters.  Here, however, the context for the prosecutor's remark does arouse suspicion because the record indicates the prosecutor labelled Juror 3505 aggressive merely for saying, in response to a question from the court (not the prosecutor himself), that she

---

than it would be for a prospective juror who had never before served on a criminal jury.

28

could think for herself.  If professing an ability to think for one's self is enough to be dubbed "aggressive," we think there is likely a problem, albeit one that lies with the person hearing the comment, not the one making it.

Considering the totality of what we have discussed—including pattern, pretext, and prosecution-friendly background—we are convinced Juror 8061's exclusion from jury service is more likely than not attributable to unconstitutional discrimination.[15]  In reaching that conclusion, we have given due consideration to the trial court's statement that there were still three Black people "in the box" at the time of the prosecutor's strike of Juror 8061.  That not all Black prospective jurors were stricken, however, is not dispositive.  (*McDaniel*, *supra*, 12 Cal.5th at 122; *People v. Arellano* (2016) 245 Cal.App.4th 1139, 1168 [reversing for *Batson* error even where the record "implie[d]" two Black prospective jurors were ultimately seated on the jury].)  A prosecutor's acceptance of a jury with at least some Black members can sometimes dispel the existence of a

---

[15]    The dissent spends noticeably little time addressing whether the record shows, more likely than not, that race motivated the peremptory challenge to Juror 8061.  Instead, it focuses on our conclusion that the trial court did not make a reasoned effort to evaluate the genuineness of the prosecution's reason for striking Juror 8061.  Even taking the dissent on its own narrow terms, the conclusion it reaches is belied by its own analysis: by acknowledging that she relies on an "*implied finding*" (*post,* page 5, italics added) that the prosecutor was credible, Justice Kim concedes the trial court's ruling does not do what our Supreme Court says it must to warrant deference in a case like this, i.e., evaluate the subjective genuineness of the prosecutor's reason.

29

discriminatory motive, but in this case such acceptance is equally consistent with a judgment by the prosecution that it could afford to press no further with additional strikes of Black prospective jurors—lest it become objectively undeniable that purposeful discrimination was occurring. We accordingly believe the prosecution's possible acceptance of some Black jurors in this case is not especially probative. The *Batson* framework is designed to ferret out purposeful discrimination, which is often difficult to prove (see, e.g., *People v. Bryant* (2019) 40 Cal.App.5th 525, 544 (conc. opn. of Humes, J.)), and the prosecution's strike of Juror 8061 is simply inexplicable on grounds other than her membership in a legally protected category.

C

In holding the prosecution's strike of Juror 8061 violated *Batson* and *Wheeler* and their progeny, we of course do not thereby brand the trial prosecutor an evil person. Some bias can be implicit. Discrimination can arise from a mistaken hope for a perceived competitive advantage rather than Jim Crow racial animus. But race should never motivate excusing a prospective juror from jury service. The constitutional rights that make up a significant part of the fabric of our democracy simply will not abide it. (*Smith v. Texas* (1940) 311 U.S. 128, 130 ["For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government"], fn. omitted.) The remedy for the violation of such rights is reversal without any need to show prejudice, followed by the opportunity for retrial before an appropriately selected impartial jury.

(*Rivera v. Illinois* (2009) 556 U.S. 148, 161; *Silva, supra*, 25 Cal.4th at 386; *Wheeler*, *supra*, 22 Cal.3d at 283; *People v. Cisneros* (2015) 234 Cal.App.4th 111, 120.)

## DISPOSITION

The judgment is reversed and the matter is remanded for retrial, assuming the People so elect.

**CERTIFIED FOR PUBLICATION**

BAKER, J.

I concur:

RUBIN, P. J.

People v. Salvador S. Salinas
B307985


KIM, J., Dissenting



I respectfully dissent.  The trial court presided over the jury selection process for two days, during which it denied an initial *Batson/Wheeler*[1] motion based on the prosecutor's peremptory challenges to three Black female jurors.  Later in the proceedings, defendant made a second *Batson/Wheeler* motion challenging the excusal of another Black woman, Juror No. 8061. The court denied that motion, finding that "the [prosecutor] provided a race[-]neutral reason for excusing that particular juror . . . ."  The majority reverses the judgment by independently reviewing the record to conclude that the prosecutor was not credible when he provided a race-neutral explanation for his use of a peremptory strike to excuse Juror No. 8061 and thereby violated *Batson/Wheeler* and their progeny.  In my view, the record does not support the majority's conclusion that the court failed to make a ""sincere and reasoned effort to evaluate the nondiscriminatory justifications offered"' by the prosecutor" such that an independent credibility finding is appropriate.  (*People v. McDaniel* (2021) 12 Cal.5th 97, 122.)

---

[1]     *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

According to the majority, "[t]he absence of a precise recollection [revealed by the trial court's comments] is reason not to accord ordinary deference" to the court's credibility finding. The majority views the record of the colloquy between Juror No. 8061 and the prosecutor as inconsistent with the court's stated recollection that the juror's response to the swimming pool hypothetical was "along [the] lines" recited by the prosecutor. But that is not how I read the record.

The colloquy with Juror No. 8061 began with her seeking clarification of the question the prosecutor wanted answered concerning the swimming pool hypothetical. She asked, "What's the reasonable answer?" In response, the prosecutor repeated, "What's the reasonable answer?" The juror then replied, "The reasonable answer is that [the boy] got in the pool." But she immediately qualified her response by adding that she did not "know that for a fact" and included an assumption, not stated in the hypothetical, that "the sprinklers could have c[o]me on."

Juror No. 8061's response prompted the prosecutor to admonish her to confine her answer to the facts of the hypothetical. He then asked the juror, ""[Y]ou think the sprinklers—" but she interrupted by volunteering that "anything could have happened." It was only after the prosecutor again asked the juror for the reasonable answer under the facts of the hypothetical that she responded, "[The boy] got in the pool."

During the second *Batson/Wheeler* motion, the prosecutor explained, "The reason I dismissed [Juror No. 8061] . . . was in regards to her responses when I gave the [swimming pool] hypothetical in regards to the reasonable versus possible. She did give pushback on what she stated was possible. And I tried to explain the reasonable issue. She basically tried to explain it

2

away saying anything is possible. And that was one of the reasons why. [¶] This case—obviously we're dealing with reasonable as opposed to possible, and a juror who thinks of other possible answers away from the facts I think would present an issue. And that was the reason why I kicked her." In response, the trial court said, "I mean, I didn't keep those exact notes. But I do remember her response along those lines."[2]

In light of the colloquy, the prosecutor's explanation of his reason can fairly be read as generally consistent with his brief and somewhat ambiguous exchange with Juror No. 8061. The swimming pool hypothetical was meant to illustrate for the jury panel the difference between a reasonable doubt, under the applicable burden of proof, and a doubt based on speculation or matters outside the evidence. Given the juror's responses, the prosecutor may have believed that she might entertain a doubt based on speculation (anything *could have* happened) or matters outside the evidence (the sprinklers *could have* come on). Thus, his explanation of why he excused her—out of concern that, notwithstanding her ultimate agreement on the reasonable

---

[2]    The majority interprets the trial court's acknowledgement that it did not "*keep* those exact notes" (italics added) to mean that it did not *take* notes. But the court's statement could alternatively mean that (1) during the prosecutor's explanation, the court took the time to review its own notes to ensure the accuracy of the prosecutor's recollection of the colloquy; and (2) although the court's notes did not mirror the prosecutor's recollection of the colloquy, they were generally consistent with the prosecutor's brief recitation of his exchange with the juror. Thus, the court's acknowledgement does not, as the majority concludes, show that the court abdicated its responsibility to conduct a reasoned evaluation of the prosecutor's justification.

3

answer, she might misapply the reasonable doubt standard—finds support in our limited record.

Moreover, the trial court's recollection that the juror's responses were "along [the] lines" of those recited by the prosecutor was, in my view, accurate. The court's ultimate finding that the prosecutor's explanation was genuine is therefore entitled to deference because it was based, not solely on the prosecutor's recollection, but rather upon a "sincere and reasoned effort" to evaluate the prosecutor's explanation for the strike.

As the colloquy shows, after a back-and-forth with the prosecutor, Juror No. 8061 agreed that the reasonable answer, based solely on the facts of the hypothetical, was that the boy got into the pool. Thus, a successful challenge to the juror for cause would have been unlikely. But, "[s]o long as prosecutors are not motivated by discriminatory intent, they can strike prospective jurors for any reason—including for reasons that don't necessarily justify a challenge for cause." (*People v. Battle* (2021) 11 Cal.5th 749, 779 (*Battle*).)

I also disagree with the majority's second reason for independently evaluating the credibility of the prosecutor's justification: the trial court's failure to provide the defense an opportunity to address the justification and its failure to follow up when the defense ultimately did respond. "''''''[T]he trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine.''''''' (*People v. Vines* (2011) 51 Cal.4th 830, 848 . . . .) However, "'[w]hen the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a

4

global finding that the reasons appear sufficient.'" (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1171 . . . (*Gutierrez*).)" (*People v. Miles* (2020) 9 Cal.5th 513, 539.) In my view, the prosecutor's stated reason, that he was concerned that the juror might not follow the law on reasonable doubt, is supported by the record and not inherently implausible.

My disagreement with the majority extends to its third reason for declining to defer to the trial court's credibility finding: the court misapprehended the governing legal framework for evaluating *Batson/Wheeler* challenges. As support for that conclusion, the majority cites the court's "along those lines" statement as evidence of its belief that (1) it was only required to determine whether the prosecutor's recollection was accurate; and (2) it was not obligated to determine whether the prosecutor's proffered reason was genuine. But this is not a case in which intervening decisional authority makes it difficult for us to "be sure from the record that the trial court applied the appropriate standard," such that we should "conduct our own independent review." (*Battle, supra*, 11 Cal.5th at p. 772.) To the contrary, the court's "duty to determine if the defendant has established purposeful discrimination," as the third and final step in the *Batson/Wheeler* inquiry (*Batson, supra*, 476 U.S. at p. 98), has been clear since the decision in *Batson*. Under these circumstances, we presume that the court was aware of and followed the governing legal framework for determining such challenges. (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114.)

Accordingly, on this record, I would defer to the trial court's implied finding that the prosecutor was credible when he proffered a race-neutral reason for his exercise of a peremptory challenge to Juror No. 8061. The "trial court enjoys a relative

5

advantage vis-à-vis reviewing courts, for it draws on its contemporaneous observations when assessing a prosecutor's credibility.  [Citation.]" (*Gutierrez, supra*, 2 Cal.5th at p. 1159.)  Thus, we should defer to trial court's credibility determinations ""'in the absence of exceptional circumstances.'"" (*People v. Lenix* (2008) 44 Cal.4th 602, 614.)  "Experienced trial lawyers recognize what has been borne out by common experience over the centuries.  There is more to human communication than mere linguistic content.  On appellate review, a voir dire answer sits on a page of transcript.  In the trial court, however, advocates and trial judges watch and listen as the answer is delivered.  Myriad subtle nuances may shape it, including attitude, attention, interest, body language, facial expression and eye contact.  'Even an inflection in the voice can make a difference in the meaning. . . .'  '[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words.  That is seen below, but cannot always be spread upon the record.' [Citation.]" (*Id.* at p. 622.)  Based on our record, there are no exceptional circumstances warranting a departure from this traditional rule of deference.

The majority's conclusion that the prosecutor's exercise of the peremptory challenge was racially motivated demonstrates the inherent limitations of exercising an independent review on a record such as this.  For instance, the majority observes that the prosecutor did not exercise peremptory challenges to either the juror in seat 19 (among the first group of prospective jurors examined) or the juror in seat 17, who later engaged in "pushback" with the prosecutor about the swimming pool hypothetical.  But, as the majority concedes, the record does not reveal the race of these jurors, which illustrates why a finding of

6

a racial motivation for the contested strike is not supported by the record.

Finally, I am unpersuaded by the majority's finding of racial motivation based on its conclusion that Juror No. 8061's answers supported an inference she would have been an ideal prosecution juror. "[J]ust because the record reveals that [the juror] had much to commend her" does not mean that the prosecutor's reasons for excusing her were pretextual or that the trial court erred in denying defendant's *Batson/Wheeler* motion. (*Battle, supra*, 11 Cal.5th at p. 779.)

In my view, the trial court did not err in denying defendant's *Batson/Wheeler* motions as to Juror No. 8061 or the other jurors who were subjects of those motions and did not violate defendant's confrontation clause rights by admitting his codefendant's statements to the police— arguments raised by defendant that the majority does not reach. I would therefore affirm the judgment.


KIM, J.


7